IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| KATHERINE SEWELL, | * | |
| Plaintiff, | * | |
| vs. | * | CASE NO. 4:25-cv-170 (CDL) |
| SCHNITZER SOUTHEAST, LLC, | * | |
| Defendant. | * | |

O R D E R

Katherine Sewell worked as a receptionist for Schnitzer Southeast until she was terminated from her employment in 2025. Sewell contends that Schnitzer discriminated against her because of her disability and disciplined and terminated her in retaliation for requesting medical leave and because of her worsening condition. Sewell asserts claims for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, as well as claims for interference and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*. Schnitzer filed a motion for summary judgment as to all of Sewell's claims. For the following reasons, that motion (ECF No. 14) is granted.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following facts. Defendant Schnitzer Southeast, a major scrap metal recycling and steel manufacturing company, hired Plaintiff Katherine Sewell to work as a receptionist in July 2022. Sewell's duties included answering phone calls, covering the cashier window, and providing clerical support, including receiving purchasing orders and requisitions and filing Daily Equipment Inspection reports.[1] Sewell was also expected to address customer issues expeditiously and interact with customers courteously. Sewell initially reported directly to Office Manager Valerie Navarre until Navarre's resignation in April 2024. After

[1] Prior to November 2024, Sewell asserts that she was never instructed to file Daily Equipment Inspection reports daily. Sewell Decl. ¶ 9, ECF No. 20-13.

a transition period, Sewell began reporting to Office Manager Renee Daniels in July 2024. Kevin Freeman, the General Manager, served as Sewell's second-level supervisor and functioned as her direct supervisor between April and July of 2024.

From the beginning of her employment, Sewell was open about her congenital heart condition, and she testified that "just about everybody" at Schnitzer knew about it, including Freeman and Daniels. Sewell Dep. 69:17-23, ECF No. 15-1. Freeman testified that he was aware of her disability and her eventual need for surgery "immediately" after she was hired. Freeman Dep. 17:24-18:11, ECF No. 15-2. Although Sewell regularly attended medical appointments and experienced symptoms associated with her condition, including breathing and circulation issues, she testified that her condition did not prevent her from performing her job duties. Sewell Dep. 68:1-25.

Sewell's performance evaluations reflected several areas for improvement throughout her employment. In October 2022, she received a score of 2.13 out of 4, with Freeman noting that Sewell was "still learning" her role. Sewell Dep. Ex. 7, 90 Day Performance Appraisal (Oct. 16, 2022), ECF No. 14-4 at 64-68. In February 2023, Navarre issued Sewell a verbal warning for substandard work and failure to follow instructions after Sewell, contrary to her training, processed a certain form and paid the customer without ensuring the form was dated, which put the company

in "violation." Sewell Dep. Ex. 18, Employee Warning Notification (Feb. 25, 2023), ECF No. 14-4 at 87. The warning directed Sewell to demonstrate "immediate and sustained improvement in her job performance" and advised that further violations of Schnitzer policies or procedures could result in additional discipline, up to and including termination. *Id.* In August 2023, Sewell received a rating of 2.67 out of 5, indicating that development was needed. Sewell Dep. Ex. 12, FY23 Professional Performance Review (Aug. 31, 2023), ECF No. 14-4 at 69. Although Navarre noted that Sewell had grown in her role and showed potential, she also identified areas for improvement, including customer interactions and learning new tasks. *Id.* at 71-74. Around this time, Sewell also testified that she received a pay raise from Freeman. Sewell Dep. 59:14-22. Freeman testified that, while he has some input in merit pay increases, he did not recommend that Sewell receive a pay increase and that the company awarded merit pay increases equally across the board. Freeman Dep. 34:3-24.

In August 2024, Sewell received a performance evaluation rating of 3.00 out of 5, indicating that she met expectations. Sewell Dep. Ex. 13, FY24 Professional Performance Review (Aug. 31, 2024), ECF No. 14-4 at 75. In the evaluation, Freeman noted that while Sewell could at times be counted on to accomplish her tasks, he wanted her to make notes to ensure that tasks were completed timely and to execute her duties more efficiently. *Id.* at 77-78.

Freeman also recognized improvement in Sewell's customer focus and decision-making but identified those areas as subjects for continued growth. *Id.* at 78-79. Two months later, Freeman emailed another employee stating that he would support Sewell's application for a logistics position within the company. Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 2, Freeman Email (Oct. 9, 2024), ECF No. 20-5. In the email, Freeman noted that Sewell did a good job but believed there was an "opportunity for us to improve by getting someone who can learn the Office Manager position and possibly be promoted to that position one day."[2] *Id.*

In November of 2024, Sewell took over two weeks of paid time off for her wedding and honeymoon.[3] Before leaving, Sewell testified that she filed all the Daily Equipment Inspection reports. Sewell Decl. ¶ 10, ECF No. 20-13. But during Sewell's absence, Daniels and Freeman observed a large pile of unfiled reports on her desk and noticed that the cash-reconciliation form had not been updated, with Daniels describing Sewell's office as a "disaster." Daniels Dep. 31:20-24, ECF No. 15-3. Both Daniels and Freeman sent Sewell an email while she was absent, reminding her that the cash reconciliation form was to be kept daily.

---

[2] Sewell testified that when Freeman was her direct supervisor, he informally told Sewell that she would be considered if she applied for an office manager position. Sewell Dep. 72:5-73:11. But after seeing Freeman's email, Sewell stated that she understood she was never considered for an office manager position. *Id.* at 81:11-23.

[3] The first day of Sewell's leave was for asthma and breathing issues. Sewell Decl. ¶ 5.

Daniels performed Sewell's filing duties during her absence, and she and Freeman cleaned and organized Sewell's customer-facing office, removing some personal items from Sewell's office. While she was away, Sewell also received a $174.39 bonus recognizing her efforts during the year. Pl.'s Resp. to Def. Mot. for Summ. J. Ex. 1, Bonus Letter (Nov. 15, 2024), ECF No. 20-4. Freeman testified that every employee received a bonus, and Sewell's bonus was not based on her individual performance. Freeman Dep. 33:18-34:2.

On the day Sewell returned to work, she attended a morning safety meeting. Sewell testified that, during the meeting, she informed Daniels that she would need medical leave for heart surgery because of increasing health issues related to her heart condition. Sewell Dep. 84:19-25. After the meeting, Sewell returned to her office and discovered that items had been rearranged or moved. She contacted Daniels about her missing items, and Daniels initially stated that Sewell would not be receiving her items back and that she would be disciplined. Sewell Dep. 96:1-13. Daniels later returned Sewell's personal items and issued her a written warning for insubordination, improper conduct, failure to properly follow instructions, and substandard or improper work. Sewell Dep. Ex. 17, Employee Warning Notification (Nov. 18, 2024), ECF No. 14-4 at 86. The warning stated that Sewell had failed to file daily reports for

approximately three weeks before taking PTO and that, when Daniels informed Sewell she would be disciplined, Sewell responded that she could not work under these conditions and slammed down the telephone.[4] *Id.* The warning again directed Sewell to demonstrate immediate and sustained improvement in her job performance and respect for team members and advised that further violations could result in additional discipline, including termination. *Id.*

Following the incident, Sewell emailed Daniels stating that she felt disrespected by the rearrangement of her office and removal of her belongings but did not intend to be disrespectful on the phone. Sewell Dep. Ex. 19, Sewell Email (Nov. 18, 2024), ECF No. 14-4 at 88. She apologized for not clearly communicating how she felt and for how she reacted in the moment. *Id.* Sewell subsequently met with Daniels and Freeman to discuss the discipline, and Daniels sent Sewell an email memorializing her duties and expectations discussed in the meeting.[5]

On November 19, 2024, Sewell emailed Freeman and Davis requesting a day off in January for a consultation concerning her heart surgery. The request was approved. In December, Sewell

[4] Sewell denied that she said this to Daniels. Sewell Dep. 88:18-21.

[5] During the meeting, Sewell stated that she had never been told that she was required to file Daily Equipment Inspection reports daily and that she filed them when she had time. November 2024 Disciplinary Meeting Recording at 00:09-00:21 (Nov. 20, 2024) (on file with the Court as Ex. 8 – Recording of November 2024 Disciplinary Meeting). Daniels responded that Sewell was required to file the reports daily. *Id.* at 00:21-00:36.

informed Freeman that she planned to schedule her surgery, and Freeman connected her with Schnitzer's third-party leave administrator, FMLASource. At the end of January, Freeman forwarded to Daniels an email the company's benefits team sent to Sewell instructing her on how to apply for FMLA leave.

On February 3, 2025, one of Schnitzer's largest customers emailed Sewell, Freeman, and Daniels requesting for a second time that Schnitzer provide a missing ticket. Sewell responded to the customer: "Be patient[.]" Sewell Dep. Ex. 25, Sewell Email (Feb. 3, 2025), ECF No. 14-4 at 95-97. The customer replied that "telling me to be patient is not a good way to explain why you have not done your job" and asked Freeman to assist with the matter. *Id.* Freeman apologized to the customer and stated that the delay was "not acceptable and will be addressed." *Id.* Sewell testified that Daniels told her it "wasn't a big deal," but Sewell understood from Freeman's response that he did not view Sewell's communication as acceptable. Sewell Dep. 126:21-127:4.

Around the same time, Sewell, contrary to direct instruction, received a requisition that had not yet been completed, which caused a $50,000 loss on Schnitzer's profit and loss statement. Freeman Dep. 45:5-17. Rather than issue separate disciplinary actions for the two incidents, Freeman and Daniels combined them into a single "final warning" and suspended Sewell one day without pay. Freeman Decl. ¶ 22, ECF No. 14-3. The warning cited

insubordination, improper conduct, failure to properly follow instructions, and substandard or improper work. Sewell Dep. Ex. 24, Final Warning (Feb. 5, 2025), ECF No. 14-4 at 94. It stated that Sewell "disrespected a customer by not communicating professionally and clearly," had not sent tickets daily as required by Daniels's prior instructions, and had received a requisition that had not been completed and approved. *Id.* The same day she received the final warning and suspension, Sewell emailed Freeman, Daniels, and Patricia Lanier, an employee in Schnitzer's human resources department, stating that she believed she was "being treated unfairly" because of her disability and upcoming surgery. Sewell Dep. Ex. 26, Sewell Email (Feb. 5, 2025), ECF No. 14-4 at 98. She also asserted that she was being disciplined for conduct she did not know was improper and that her workload had increased despite not receiving adequate training from her former supervisor, Navarre. *Id.* After receiving the email, Lanier spoke with Sewell on the phone, conducted separate interviews with Freeman and Daniels, and also met with Sewell, Freeman, and Daniels together to discuss Sewell's allegations of discrimination, the final warning, and her performance history. Lanier Dep. 33:11-18, 37:16-38:2, ECF No. 15-4. At this meeting, Sewell reiterated her concerns about needing adequate training, and the parties discussed additional training and expectations going forward. Sewell Dep. 129:3-9. Sewell also testified that an agreement was

reached at the meeting, where Freeman would sign off on requisitions over $5,000 before Sewell would receive them. Sewell Dep. 137:11-24; Sewell Decl. ¶ 15.

On March 4, Freeman forwarded Sewell's submitted FMLA request with FMLASource to Daniels, which showed that Sewell requested leave from April 1 to June 2 due to her upcoming heart surgery. The following day, Daniels emailed Sewell asking why a requisition had not been received, which resulted in the company's profit-and-loss statement understating expenses by approximately $70,000.[6] Sewell Dep. Ex. 31, Daniels Email (Mar. 5, 2025), ECF No. 14-4 at 101-102. Sewell responded that she had placed the requisition in Freeman's folder because she believed Freeman was required to approve such requisitions. *Id.*; Sewell Decl. ¶ 21. Daniels explained that, even if the process had changed, she still informed Sewell to receive the requisition once the change happened with the funds. *Id.* Sewell responded that she "may have just forgotten" but later testified that Daniels did not tell her to receive the request that day. *Id.*; Sewell Decl. ¶ 20.

Following this incident, Daniels and Freeman, in consultation with Lanier, terminated Sewell's employment. The termination documentation cited Sewell's failure to follow instructions and

[6] This was the same requisition that Sewell was disciplined for in February. Freeman Dep. 46:23-47:3. After receiving it when she was not supposed to in February, Sewell "tried to unreceive it, which didn't work." *Id.* at 47:7. And by the end of February, the bill had increased to $70,000. *Id.* at 47:9-18.

failure to demonstrate immediate and sustained improvement in her job performance despite prior warnings and meetings. Sewell Dep. Ex. 30, Termination Document (Mar. 13, 2025), ECF No. 14-4 at 100. On the morning of her termination date, FMLASource approved Sewell's requested FMLA leave. Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 7, Leave Approval Email (Mar. 13, 2025), ECF No. 20-10.

DISCUSSION

Sewell asserts that Schnitzer retaliated against her in violation of the ADA and FMLA, discriminated against her in violation of the ADA, and interfered with her rights under the FMLA. Schnitzer moved for summary judgment on all claims, arguing that Sewell has not produced sufficient circumstantial evidence from which a reasonable jury could infer discriminatory or retaliatory intent.

**I. Sewell's ADA and FMLA Retaliation Claims**

Sewell contends that Schnitzer unlawfully retaliated against her by issuing discipline in November 2024 and February 2025 and by terminating her employment in March 2025. The ADA prohibits retaliation against an individual for opposing any unlawful act or practice in violation of the ADA. 42 U.S.C. § 12203. The FMLA likewise prohibits an employer from discriminating against an individual for exercising rights protected by the FMLA. 29 U.S.C. § 2615(a)(2). To establish a prima facie case of retaliation under

either statute, a plaintiff must demonstrate that "(1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the two." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). The third element of both ADA and FMLA retaliation claims requires a showing of but-for causation. *Id.*; *see also* Lapham *v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023)("[W]e hold that the proper causation standard for FMLA . . . retaliation claims is but-for causation."). Thus, to survive summary judgment, Sewell must present enough evidence for a reasonable jury to find that the employer "intentionally retaliated against the plaintiff because of the plaintiff's activity." *Ismael v. Roundtree*, 161 F.4th 752, 762 (11th Cir. 2025).

Sewell contends that she has presented a "convincing mosaic of circumstantial evidence" that would allow a jury to infer intentional retaliation by Schnitzer. *Id.* at 760 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Despite its "flowery language," the convincing mosaic analysis is "a stand-in for the Rule 56 summary judgment standard applied to employment discrimination." *Id.* "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023).

A plaintiff can show a convincing mosaic by presenting evidence of "(1) suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Ismael*, 161 F.4th at 760.

Sewell primarily relies on evidence of suspicious timing to show retaliatory intent. She contends that she had a positive employment history before beginning to take steps towards receiving FMLA leave for her heart surgery and that, each time she took another step toward obtaining leave, Schnitzer responded with increasingly severe discipline. While "'very close' temporal proximity between a protected activity and an adverse action can create an inference of causation . . . the intervening discovery of employee misconduct can sever the causal inference created by temporal proximity." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023)(quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). Because Sewell challenges three separate employment actions, the Court considers each in turn.

A. November 2024 Discipline

Sewell first contends that the November 2024 written warning was retaliatory because she received it within hours of informing Daniels that she would need medical leave for heart surgery. The

surrounding circumstances, however, do not support an inference that the warning was motivated by Sewell's request for leave.

Contrary to Sewell's assertion, she did not have an unblemished performance record before November 2024. In February 2023, she received a verbal warning for substandard work and failure to follow instructions, which expressly advised her that future violations could result in further discipline, up to and including termination. Her August 2023 performance evaluation likewise identified areas for further development, and while her August 2024 evaluation reflected that she met expectations, Freeman continued to identify areas in which Sewell needed to improve, including completing tasks timely and efficiently, customer focus, and decision-making. And although Freeman had supported Sewell's application for another position within Schnitzer and stated that she did a good job, he also indicated that he viewed her potential vacancy as an opportunity to hire someone who had the potential to be promoted to the position of Office Manager. Thus, the record does not support Sewell's characterization of her pre-November performance as uniformly positive.

The circumstances immediately preceding the November warning also provide a legitimate explanation for the discipline. While Sewell was away on her wedding and honeymoon, Daniels and Freeman observed a substantial number of unfiled Daily Equipment

Inspection reports on Sewell's desk and discovered that the cash-reconciliation form had not been kept current. Daniels and Freeman reminded Sewell of her responsibilities while she was away, and Daniels performed Sewell's filing duties during her absence. Daniels and Freeman also cleaned and organized Sewell's customer facing office, which Daniels described as a "disaster." Daniels Dep. 31:20-24. When Sewell returned and reacted after learning that she would receive discipline, which she later apologized for, Daniels issued the written warning based on the condition of Sewell's office, unfinished tasks, and her response to Daniels.

Sewell points to the fact that she received the warning shortly after informing Daniels of her need for surgery. But she identifies no evidence that Daniels or Freeman expressed hostility toward her surgery, disability, or anticipated leave. To the contrary, the record reflects that Schnitzer had documented performance deficiencies before Sewell requested leave, and Daniels and Freeman had already communicated Sewell's job expectations to her and cleaned and re-organized her office before Sewell informed Daniels she would need medical leave. And although Sewell received a $174.39 bonus while she was away, Freeman testified that all Schnitzer employees received a bonus, and Sewell's was not based on her individual performance.

Accordingly, although the timing of the warning may be suspicious in isolation, the surrounding evidence does not permit

a reasonable jury to infer that Sewell's request for medical leave was the reason for the discipline.

B. February 2025 Discipline

Sewell next contends that the February 2025 final warning and one-day suspension were retaliatory because they occurred approximately one week after she had begun the process of obtaining FMLA leave. Again, the timing alone is insufficient to establish retaliatory intent where the record contains undisputed evidence of intervening performance problems which "undercuts the inference" that Sewell's request for leave caused the discipline. *Berry*, 84 F.4th at 1309.

The record shows that Sewell emailed one of Schnitzer's largest customers to "[b]e patient" in response to the customer's second request for a ticket. Sewell Email (Feb. 3, 2025). Although Sewell testified that Daniels told her the incident was not a big deal, Freeman apologized to the customer on behalf of Schnitzer and stated that the delay was "not acceptable and will be addressed." *Id.* The undisputed evidence also shows that around this same time, Sewell received a requisition that had not yet been completed, which caused a $50,000 loss on Schnitzer's profit and loss statement. Freeman and Daniels elected to combine these two incidents into one final warning rather than separate disciplinary actions, resulting in a one-day unpaid suspension. The warning cited Sewell's unprofessional communication with a

customer, failure to follow Daniels's instructions regarding tickets, and failure to properly complete the requisition. Sewell does not dispute that these events occurred but argues that the timing of the final warning implies a retaliatory motive. The February discipline, however, followed specific performance-related incidents and was consistent with the progressive discipline Schnitzer had previously imposed on Sewell. Thus, the record does not permit a reasonable inference that Sewell's request for FMLA leave, rather than her performance, motivated the February discipline.

C. March 2025 Termination

Lastly, Sewell contends that the temporal proximity between her FMLA leave request and her termination establishes retaliatory intent. The record reflects that, on March 5, Sewell failed to receive a requisition that resulted in approximately $70,000 in understated expenses on Schnitzer's profit-and-loss statement. Sewell points to evidence that she believed Freeman was required to approve the requisition before she received it and that Daniels's account of whether she instructed Sewell to receive it was inaccurate. But when Daniels asked Sewell why she had not received the requisition as instructed, Sewell admitted that she "may have just forgotten." Daniels Email (Mar. 5, 2025). Following this incident, Daniels and Freeman, in consultation with Lanier, terminated Sewell for failing to follow instructions and

failing to demonstrate immediate and sustained improvement despite having received prior warnings.

Simply put, by the time Sewell submitted her FMLA request, Schnitzer had already documented multiple performance deficiencies, issued a final warning, and identified another significant performance issue involving a requisition that resulted in approximately $70,000 in understated expenses. Sewell does not identify any evidence that Schnitzer's stated reasons were false or that her disability and exercise of her FMLA rights actually motivated the termination. Sewell "points to evidence of suspicious timing," but her documented performance deficiencies "fatally undermine[] the probative value of temporal proximity between her protected activit[ies] and her termination." *Berry*, 84 F.4th at 1312. And Sewell identifies no evidence that the decisionmakers treated similarly situated individuals more favorably, that Schnitzer's justification was pretextual, or any other bits and pieces from which an inference of retaliatory intent might be drawn. Thus, the Court finds that the circumstantial evidence produced by Sewell does not "allow[] a reasonable juror to envision an image of retaliation." *Ismael*, 161 F.4th at 764. Accordingly, Schnitzer's summary judgment motion is granted as to Sewell's ADA and FMLA retaliation claims.

## II. Sewell's ADA Discrimination Claim

Sewell also asserts that she was unlawfully discriminated against due to her "worsening" heart condition. Pl.'s Resp. to Def.'s Mot. for Summ. J. 11, ECF No. 20-1. The ADA provides that no covered employee shall discriminate against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must show: "(1) she is disabled, (2) she was a 'qualified individual' when she was terminated, and (3) she was discriminated against on account of her disability." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016)(quoting *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003)). It is undisputed that Sewell is disabled and a qualified individual within the meaning of the ADA.

Sewell again relies primarily on temporal proximity to satisfy the "convincing mosaic" standard, arguing that discriminatory intent can be inferred because the discipline and termination occurred after Daniels learned of Sewell's "worsening" heart condition. Pl.'s Resp. to Def.'s Mot. for Summ. J. 11. The Eleventh Circuit has stated that the convincing mosaic standard applies "in equal measure to claims of discrimination and retaliation." *Ismael*, 161 F.4th at 760. And as discussed earlier,

the probative value of the temporal proximity between Sewell's efforts to obtain medical leave for her heart surgery and Schnitzer's disciplinary actions and termination is undermined by the documented performance deficiencies that preceded those actions. Moreover, the record establishes that Freeman and Daniels knew of Sewell's heart condition and anticipated need for surgery well before the November 2024 discipline. Yet Sewell does not argue that she ever experienced hostility or was treated unfavorably because of her disability prior to November 2024. Instead, the evidence shows that Schnitzer continued to employ Sewell for over two years after learning of her heart condition and anticipated need for surgery. Thus, the Court finds that Sewell has not produced a convincing mosaic of "enough circumstantial evidence to raise a reasonable inference of intentional discrimination" and grants Schnitzer's motion for summary judgment on Sewell's ADA discrimination claim. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023)(quoting *Hamilton v. Southland Christian Sch.*, 680 F.3d 1316, 1320 (11th Cir. 2012)).

**III. Sewell's FMLA Interference Claim**

Count three of Sewell's complaint asserts a claim for FMLA interference against Schnitzer. Schnitzer moved for summary judgment on this claim, arguing that Sewell did not produce evidence that she was denied an FMLA benefit to which she was

entitled. Because Sewell did not respond to Schnitzer's argument as to this claim, Sewell's claim for FMLA interference is deemed abandoned. *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)(en banc)("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Accordingly, this claim is dismissed.

CONCLUSION

For the reasons set forth above, Schnitzer's motion for summary judgment (ECF No. 14) is granted.

IT IS SO ORDERED, this 4th day of September, 2026.

S/Clay D. Land

CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA